State *vs.* Shaw.

HEARD NOVEMBER TERM, 1877.

STATE *vs.* SHAW.

Under the Constitution of the State, Circuit Judges must be elected by "joint ballot" of the General Assembly, as directed by § 13, Art. IV, and not *viva voce*, as directed by § 24, Art. II; otherwise the election will be null and void.

This was an application by the Attorney General to the original jurisdiction of the Supreme Court for a judgment of "ouster" against the Hon. A. J. Shaw, one of the Circuit Judges of the State, from office, on the ground that he had been unconstitutionally elected.

The facts were: that at an election held on February 12th, 1875, for Judge of the Third Judicial Circuit to fill the unexpired term of Hon. J. T. Green, deceased, the Hon. A. J. Shaw was voted for, received a majority of the votes given, and was declared elected; that the voting was *viva voce* as directed by Section 24, Article II, of the Constitution of the State, and not by ballot, as directed by Section 13, Article IV; that he was commissioned by the Governor, qualified, and entered upon the duties of his office.

The Articles of the Constitution mentioned are as follows:

### ARTICLE II.—LEGISLATIVE DEPARTMENT.

"SEC. 24. In all elections by the General Assembly, or either House thereof, the members shall vote '*viva voce*,' and their votes thus given shall be entered upon the Journal of the House to which they respectively belong."

### ARTICLE IV.—JUDICIAL DEPARTMENT.

"SEC. 13. The State shall be divided into convenient Circuits, and for each circuit a Judge shall be elected by 'joint ballot' of the General Assembly, who shall hold his office for a term of four years, and during his continuance in office he shall reside in the circuit of which he is a Judge."

NOTE.—It must not be supposed by persons not intimately acquainted with the judicial and political history of South Carolina at, and for a few years prior to, the commencement of this proceeding that there was any objection whatever to Judge Shaw; on the contrary, he was more esteemed than any of the Circuit Judges then in office, and there is no doubt whatever that the proceeding against him would never have been instituted had not other Circuit Judges of the State been in the same category, and they, with some exceptions. the State desired to get rid of, and, as proof of this, we may mention the fact that Judge Shaw was immediately elected to the same office by the unanimous vote of the General Assembly.

The following briefs were filed:

*Points and authorities of LeRoy F. Youmans, Attorney General:*

1. This proceeding was instituted by my predecessor to test the validity of the election of A. J. Shaw as Circuit Judge. He was elected by the joint vote of the General Assembly, the members thereof voting *viva voce,* and claims that Section 24, Article II, of the Constitution, providing that in all elections by the General Assembly the members shall vote *viva voce,* is the law of the case. If this view be correct, this proceeding should fail. The State claims that Section 13, Article IV, providing that for each circuit a Judge shall be elected by joint *ballot* of the General Assembly, is the law of the case. If this view be correct, this proceeding should succeed. Should the *general* provision in that part of the Constitution relative to the legislative department, Article II, or the *special* provision in that part of the Constitution relative to the *judicial* department, Article IV, prevail? The authorities seem clear that the latter and special provision must prevail.—Potter's Dwarris, 117, *et seq.,* 272, 273, *et seq.,* and cases cited; Sedg. on Con. and Stat. Law, 60, 61.

2. A fanciful distinction has been suggested between elections by "joint ballot" and "by ballot jointly" of the General Assembly, but the phraseology of South Carolina legislation negatives the idea.—Bell. S. C. Elec. Laws, 510.

3. Voting by *ballot* being the depositing a little ball or ticket into a ballot box, and voting *viva voce* being speaking the name by word of mouth, the former being *secret,* and so intended to be, the latter being *open,* and so required to be, it follows that if the Constitution requires the former mode an election by the latter mode is illegal and confers no title.—*Botts* vs. *Jones,* 2 Cong. Elec. Cas., 73; *Ottero* vs. *Gallegos,* 2 Cong. Elec. Cas., 177; *Easton* vs. *Scott,* 1 Cong. Elec. Cas., 272; *Comwonwealth* vs. *Reed,* Brightley's Elec. Cas., 126; 2 Ashmead, 261.

4. The journal of the convention showing the attention paid to and the history of this clause, (260, 261, 854, 856,) the ordinance for the ratification of the Constitution by the people, (14 Stat. 31, introduction,) and its ratification by the people all conspire to show that the view taken by the State should prevail.

*Additional authorities cited by LeRoy F. Youmans, Attorney General:*

### GENERAL WORDS QUALIFIED BY SPECIAL PROVISIONS.

*The King* vs. *Archbishop of Armagh*, 8 Mod. Rep., 8; *Thornby* vs. *Fleetwood*, 10 Mod. Rep., 115, 408; *Roper* vs. *Radcliffe*, 10 Mod. Rep., 242; *Gregory's* case, 6 Coke, 19 b.; *Dr. Bonham's* case, 8 Coke, 118 b, 119 a.

"ALL."—*Dr. Bonham's case*, 8 Coke, 118 b, 119 a; 1 Jar. on Wills, 416; *State* vs. *Sullivan*, 14 Rich., 283.

### CONTEMPORANEOUS CONSTRUCTION.

Broom's Max.; *Gorham* vs. *Bishop of Exeter*, 5 Welsby, Hurlstone and Gordon, (Exchequer,) 667; Baron Alderson; *Barbat* vs. *Allen*, 7 Welsby, Hurlstone and Gordon, (Exchequer,) 617, Pollock, Chief Baron; *King* vs. *Inhabitants of Eriswell*, 3 Term Rep., 721; *Hart* vs. *Frame*, 6 Cl. and Fin., 199; Lord Denman in *O'Connell* vs. *Regina;* Broom's Leg. Max., 7th Am. Ed., 134, 140.

### PRINCIPLES OF CONSTRUCTION.

Wigram on Wills, 15, 17; *Frazer* vs. *Boone*, 1 Hill Ch., 360; *Horlbeck* vs. *St. Philip's Church*, 13 Rich. Eq., 138, 139; *State* vs. *Aldermen of Charleston*, 1 S. C., 39.

### CONSTRUCTION OF CONSTITUTIONS.

Cooley, 58, 59, 66.

### WEBSTER'S DEFINITIONS:  ELECT—BY—JOINT—BALLOT.

"BALLOT."—*Williams* vs. *Stein*, 38 Ind., 89. Meaning fixed in the Constitution before its occurrence here.—*Richardson* vs. *Watson*, 4 B. and Adolph, 799.

"JOINT BALLOT."—Meaning fixed by previous Constitutions and Acts of Assembly, and legislators speak the language of the law.—*Roper* vs. *Radcliffe*, 10 Mod. Rep., 234.

A committee of revision and style would have brought the two provisions together—the mode of election of Circuit Judges—as an exception to the general mode of elections by the General Assembly.

*Argument of Simonton & Barker, for Defendant:*

I. The Constitution of the State, as the fundamental law of the land, provides that in all elections by the people the electors shall vote by ballot.—Art. VIII, § 1.

That in all elections by the General Assembly, or either house thereof, the members shall vote *viva voce*, and their votes thus given shall be entered on the Journal of the House to which they respectively belong.—Art. II, § 24.

The reason for this distinction between the mode of voting by the constituent and by his representative is obvious. The people vote by an inherent sovereign right, inseparable from their existence as citizens of a free country. The representative makes use of the right to vote solely from the grant of such right in the Constitution. He exercises but a delegated authority. He votes for and in the stead of his constituents. No one has the right to inquire how a citizen votes. He is a sovereign, and one of the safeguards by which he hedges in his sovereignty in this respect is the right to conceal his vote.

Every citizen has the right to know how his representative votes. One of the checks upon the representative, the safeguard of the citizens whom he represents, is that his vote in his representative character must be open, public, subject to scrutiny.

This is the plain, broad distinction made in the express words of the Constitution. If the position taken by the Attorney General be correct, this distinction is broken down and obliterated.

II. The General Assembly is the creature of the Constitution. It owes all of its powers to the instrument creating it. The Constitution could as well have made one house as two. It could have dispensed with the General Assembly altogether. It could have given it powers purely legislative, with no power in the selection of officers in the other departments. It could have provided for the election of the officers in the executive or judicial departments by the people, by the Legislature or by the Executive. In searching for the powers of the General Assembly, certainly in seeking to discover the mode in which it shall exercise its powers, we must look to the Article of the Constitution which created it. That Article gives to the General Assembly legislative powers in which the Legislature is supreme, and certain other powers, not at all legislative, but representative in their character, such as the election

of various officers, in which the General Assembly acts simply in the stead of the people. In the use of its purely legislative powers the scrutiny of the people into the action of the General Assembly is exercised only in certain cases, such as the increase of the public debt, the change of the fundamental law, the consideration of the veto of the Governor, or the demand of two members that the vote be recorded. In these cases only must the representative so act that his action is recorded for the examination and judgment of his constituents. But in the exercise of their representative powers, the Constitution directs that in all instances the votes shall be *viva voce* and spread at large on the journal.

If the position taken by the Attorney General be correct, the result will be the engrafting into the Constitution of the grant to the General Assembly of a new and contradictory power.

It is not contended that this grant is made directly. If it be given at all, it is given indirectly and only by implication.

After providing for the General Assembly, and after giving it its powers, and prescribing to it the mode in which these powers should be exercised, the Constitution passes on to the other co-ordinate departments. After devoting the third Article to the executive, it provides in the fourth Article for the judicial department. It creates in this Article Supreme, Superior or Circuit Courts and Inferior Courts. In making provisions for the Circuit Courts it uses the expression upon which the whole argument of the Attorney General depends : " The State shall be divided into convenient circuits, and for each circuit a Judge shall be elected by joint ballot of the General Assembly."

It is contended that this Section irrevocably fixes the mode in which the General Assembly shall elect, in joint assembly, the Circuit Judges by the secret vote ; that it is thus in direct conflict with the whole scheme of the Constitution respecting the mode in which the people shall elect and the mode in which the General Assembly can elect, and is also against the express words in which the power of election is granted to the General Assembly in Section 24, Article II. That, in fact, it is repugnant to this Section, and as it occurs in a subsequent Section of a subsequent Article of the Constitution, it repeals the prior Section *pro tanto.*

We submit that the proper course to be pursued in construing any instrument is to give each provision its full force ; to inquire if all the parts cannot stand together ; to reconcile clauses which are

apparently contradictory, and only as a last resort to allow one to destroy or impair the other. That the fundamental canon of construction is that all parts of the instrument be construed together, so that every part will have effect. Repugnancy must be avoided if possible, and it is only when the parts are irreconcilable with each other that the first parts of a deed and the last parts of a will control.—See Cooley on Con. Lim., 58.

If we say, as the Attorney General says, that this Section of the fourth Article repeals the Section of the second Article *pro tanto*, we abandon all hope of reconciling these Sections and admit and declare a repugnancy. We submit that this is not good construction.

If, on the other hand, we seek to reconcile the two Sections, we can do so by holding that the words "joint ballot" are *generic;* that they are used not in their most narrow and technical signification, but in their popular sense, in every day use; that they signify the act and not a particular mode of voting.

Let us examine the proceedings of the Convention which framed the Constitution and see how these words were used by the persons who drew the instrument. When this clause of the Constitution was under discussion the question was who should select the Judges, the people directly, or the General Assembly for the people. After an animated, and, we may say, an exhaustive discussion, it was finally determined that the General Assembly should select these officers.

The argument was not directed to the manner of voting but solely to the question of how the voting should be done,—should the principal or the agent select. It was decided that the agent should do so, and the clause was passed in these words: "The State shall be divided into convenient circuits, and for each circuit there shall be elected a Judge by the joint vote of the General Assembly."

We see nothing more of this Section, or of the fourth Article of the Constitution, until it was finally ratified, and then, for the first time, we see the words joint ballot substituted for joint vote. No other change is made; nor is the change made by a vote of the Convention. If the Convention supposed that they were making a radical change in their Constitution—that they were repealing a Section of it which they had already adopted, they would, *ex necessitate*, have done so by a vote. The Section of the second Article, and the provision of the fourth article, both of which had been passed by the Convention, could not have been changed but by a vote, and

the latter could not have been altered except by the reconsideration of a vote. No vote as to such change was taken, and the conclusion is inevitable that none was intended. The Convention evidently supposed that they were ratifying the same provision which they had adopted after a long discussion; that the words of the amendment and the words of the engrossed Constitution were synonyms; that as they had already declared an invariable rule for the General Assembly, as to its manner of voting, this Section of the fourth Article simply gave to the General Assembly the power of selection of Circuit Judges in the mode prescribed.

It may be said, however, that the validity of the Constitution depended upon its ratification by the people, and that when it was so ratified it had in it these words: "joint ballot," without any explanation of the sense in which they were used; that thus the words should be used technically. Without dwelling upon the position that when the people ratified the Constitution they must have done so subject to a legal construction of their intent, we submit that the words of the Constitution must be construed, not technically or strictly, but according to their plain, every-day, familiar, common sense meaning. There is this difference between the manner of construing deeds and statutes and the manner of construing Constitutions: The former in their use of technical words are construed technically. In the latter, the words are construed according to their popular use and signification. Constitutions are submitted to the masses, are construed by the masses, owe their existence to the approval of the masses, and the masses know nothing of technicalities.—Dwarris on Statutes.

Now, what is the common use and understanding of the term "ballot," joint ballot, when the election of officers is spoken of? It is understood to mean the act of voting, not the manner of voting.

In all party conventions the mode of voting is *viva voce.* Indeed, in these United States, the rule of all representative bodies is that the manner of voting should be *viva voce;* voting by ballot, that is by a little ball or slip of paper, is a relic of the past. Yet, in speaking of the result of the voting in the party conventions, the journals of the body, the members who compose it, the newspapers, everybody, speak of the result of the first ballot, second ballot, third ballot, etc., and of the success of the candidate on the last ballot.

In the journals both of the House and of the Senate for 29th July, 1868, when the Justices of this Court were elected *viva voce*, the result of the first ballot, of the second ballot and of the third ballot for Chief Justice are given, and each voting is so designated. So, also, with regard to the Associate Justices.—House Journal, special session, 1868, p. 132, etc.; Senate Journal, special session 1868, p. 93, etc.

If we examine the contemporaneous and practical construction of this Section of the Constitution, we will come to the same construction of these words of the Constitution. Mr. Cooley, in his work on Constitutional Limitations, speaking of contemporaneous and practical construction of Constitutions, says: "An important question which now suggests itself is this: How far the contemporaneous construction or the subsequent practical construction of any particular provision of the Constitution is to have weight with the Courts when the time arrives at which a judicial decision becomes necessary? Contemporaneous construction may consist simply in the understanding with which the people received it at the time or in the acts done in putting it in operation, or which necessarily assume that it is to be construed in a particular way. In the first case it can have very little force, because the evidences of the public understanding when nothing has been done under the provision in question must always necessarily be vague and undecisive. But when there has been a practical construction which has been acquiesced in for a considerable period, considerations in favor of adhering to this construction sometimes present themselves to the Courts with a plausibility and force which it is not easy to resist. Indeed, when a particular construction has been generally accepted as correct, and especially when this has occurred contemporaneously with the adoption of the Constitution, and by those who had opportunity to understand the intention of the instrument, it is not to be denied that a strong presumption exists that the construction rightly interprets the intention. Especially when this has been given by officers in the discharge of their duty, and rights have accrued in reliance upon it, which would be divested by a decision that the construction was erroneous, the argument *ab inconvenienti* is sometimes allowed to have great weight."—Cooley on Con. Lim., 67.

In *Stuart* vs. *Laird*, (1 Cranch, 299,) the question was made before the Supreme Court of the United States as to the right of Justices of the Supreme Court to hold the Circuit Courts of the United

States.   The decision was in 1803, and in these words: "Another
reason for reversal is that the Judges of the Supreme Court have
no right to sit as Circuit Judges, not being appointed as such, or,
in other words, that they ought to have distinct commissions for
that purpose.   To this objection, which is of recent date, it is suffi-
cient to observe that practice and acquiescence under it for a period
of several years, commencing with the organization of the judicial
system, afford an irresistible answer and have indeed fixed the con-
struction.   It is a contemporary interpretation of the most forcible
nature.   This practical exposition is too strong and obstinate to be
shaken or controlled.   Of course the question is at rest and ought
not now to be disturbed."

Now, the first General Assembly formed under the present Con-
stitution consisted mainly of persons who were members of the
Convention which adopted it.   This General Assembly elected eight
Circuit Judges, and each one was elected in joint assembly *viva voce*.
This continued to be the uniform practical construction of the Con-
stitution until this year.   Indeed, so deeply is it fixed in the minds
of the Legislature that the words "joint ballot" mean nothing but
the act of voting, that the present General Assembly, in filling the
vacancy caused by the resignation of the late Attorney General,
proceeded to do so by a *viva voce* vote, notwithstanding that the
Act authorizing it declared that such vacancy should be filled by
an election by joint ballot of the General Assembly, (A. D. 1875,
15 Stat., 935,) and this without question or demur on the part of
any member of either house.

If we examine the Constitution, we will discover that the only
offices which the General Assembly is authorized by that instru-
ment to fill are those of the Justices of the Supreme Court and of
the Judges of the Circuit Courts; of course each branch of the
General Assembly elects its own officers, but the General Assembly,
as a body, elects these judicial officers only.   Now, can it be sup-
posed that the general rule that all elections by the General Assem-
bly shall be *viva voce* should be laid down so broadly as it is in
Section 24, Article II, and that the provisions of Section 13, Arti-
cle IV, are an exception to the rule, when, by the general rule, only
three offices are filled, and, by the exception, at least eight are
filled?   In such a construction, which is the rule and which the
exception?

What can be the reason and motive for such an exception?

The people have the right to elect all officers. They delegate to certain of their agents the duty of selecting judicial officers. They have the right to know how their agents execute this delegated authority. They require that in the selection of the Justices of the Supreme Court the act of each delegate should be published and recorded. The interests involved are too grave to dispense with this wise and needful precaution. Is there less interest or importance in the selection of Circuit Judges? The Judges of these Circuit Courts are thrown directly in contact with the people. They have in their hands the dearest interests of the citizen—his life, liberty and property. It is only in exceptional cases that the litigant can come to the Supreme Court. He must go to the Circuit Court in nearly every instance, and in very many cases is dependant upon the discretion of the Judge. The decision of that Court is final in such cases.

If, then, it be deemed necessary that the people should supervise and scrutinize the votes of their representatives, with respect to the Supreme Court, in order that the best men for this august tribunal should be selected, for a yet stronger reason they should have the same scrutiny and supervision over the selection of the Circuit Judges, in whose purity, wisdom, discretion and ability they have so near and such important interests.

*Argument of Samuel Dibble, of counsel for Respondent:*

Proposition: The constitutional mode of electing a Circuit Judge is by voting *viva voce.*

I. There are two ordinary *modes* of election, viz., voting *viva voce,* which is essentially open and public, and voting by ballot, which is essentially secret. The theory of our State Constitution is that in all elections by the people the secrecy of the vote shall be impenetrable, so as to insure the free action of the voter, but that in all elections by the Legislature the action of each member should be open to the scrutiny of his constituents, so as to preserve the full accountability of the legislator to the people, of the agent to the principal, of the representative to the sovereign. Hence it is provided in Article VIII, Section 1, that "in all elections by the people the electors shall vote by ballot;" while in Article II, Section 24, it is ordained that "in all elections by the General Assembly or either house thereof the members shall vote *viva voce,* and

their votes thus given shall be entered upon the journal of the house to which they respectively belong." The same principles prevail in the fundamental laws of other States. Take for example the Constitution of Indiana. Article II, Section 13, of her Constitution reads: "All elections by the people shall be by ballot, and all elections by the General Assembly or either branch thereof shall be *viva voce.*" In relation to this Section the Appellate Court of Indiana well remarks: "Here are two modes of election provided for and enjoined—the one applicable to the General Assembly, the other to all elections by the people. There is no trouble in determining that the *viva voce* method was intended to secure publicity; and the reason for such publicity is equally manifest. Elections by the General Assembly must be *viva voce.* And why? Because the members of that body are agents or representatives of their several constituencies, to whom they are responsible for their votes, and to that end they must vote openly and audibly, that it may be known how they are exercising their delegated authority. No such reason, if indeed there be any, exists as to the voter at a popular election. He represents nobody, and is responsible to nobody for the vote he may cast. He should vote honestly and intelligently, and under our system he is presumed to do so; but he has the absolute right to exercise the franchise as he pleases, uncontrolled and unquestioned by any person or power."—*Williams* vs. *Stein,* 38 Ind., 89.

It may be useful to take a cursory review of the constitutional history of South Carolina in this connection. Under the Constitutions of 1778, 1790 and 1861, elections were held by ballot, whether the people voted or the General Assembly; and nearly all public officers were elected in this manner by the Legislature instead of by the people. But the Convention of 1865 made several radical changes in our political system. The election of Governor and of various State and local officers was given to the people, and it was ordained also that the General Assembly in all elections should vote openly and that each member's vote should be recorded. Hon. B. F. Perry, Provisional Governor, in his first message to the Convention, after advising that various "elections and appointments should be taken from the Legislature," proceeds as follows: "In all elections made by the Legislature, the voting should be *viva voce,* so that each member's constituents might know how he voted. The ballot is secret and conceals the member's vote from his constitu-

ency.   The people have a right to know how their representatives
voted in elections as well as in legislation.   In all elections by the
people the ballot is certainly the proper mode, for it enables every
man to vote independently, according to his own convictions.   No
one has any right to know or question his vote.   He votes as a
sovereign.   But the representative votes for others, and they have
a right to know how he votes."—Jour.  Conv., S. C., 1865, p. 16.
On the day when this message was read, (which was the second day
of the Convention,) Mr. Orr, of Anderson, introduced a resolution,
which was referred to an appropriate committee : "That all elec-
tions by the Legislature shall be made *viva voce*, and the name of
the member and of the person voted for recorded."   On the follow-
ing day the Governor's message was considered and the subject of
"voting *viva voce* in elections by the Legislature" was referred to
the Committee on the Legislative Department of the Constitution.
Three days afterwards a report was made on Mr. Orr's resolution
by the Committee on Amendments to the Constitution, and it was
subsequently acted upon by the Convention in connection with the
report of the Committee on the Legislative Department, the result
being the adoption of the suggestions of the Provisional Governor,
in the terms of our present Constitution, which are taken *verbatim*
in this particular from the Constitution of 1865.   On the last 'day
of the session of the Convention, a congratulatory message was re-
ceived from Governor Perry, in which he alludes to the fact that
the Convention had "declared the responsibility of the representa-
tive to his constituency by *viva voce* voting in the Legislature."—
Jour. Conv., 1865, p. 130.

But although, under the Constitution of 1865, the share of the
masses in the administration of the State was greatly enlarged, yet
a factor was introduced into our political system, three years later,
which required that the scheme of the State Government should be
still further popularized, to meet the demands of the advocates of
universal suffrage; and accordingly we find the Constitution of
1865 was not satisfactory to the majority of the voters of 1868.
One needs only to read the debates of the Convention of 1868 and
the Constitution then adopted to become convinced that Mr. A. G.
Mackey, the President of the Convention, correctly expresses, not
simply his own views, but those of the delegates and their constitu-
ents, when, in the preface to the journal of that Convention, he
characterizes the Constitution of 1865 as "in some respects an

improvement on that of 1790," yet "not such an instrument as the progressive spirit of the age demanded." And, notwithstanding this dissatisfaction with the Constitution of 1865 in general, we find that the Section of that Constitution prescribing that all elections by the Legislature shall be *viva voce* was reported *verbatim* to the Convention of 1868 as a part of the Article on the legislative department, and that it passed the Convention without question or debate. In fact, there was no room for any extension of its terms. "In *all* elections by the General Assembly, or either house thereof," is so comprehensive as in its very words to admit of no exception.

We have dwelt at some length on the constitutional history of South Carolina since the war, because the state of the public mind at the time of the adoption of the Constitution of 1868 renders us legitimate assistance in the construction and interpretation of its provisions. As is well remarked by Judge Story in *Prigg* vs. *Pennsylvania,* 16 Pet., 610: "Perhaps the safest rule of interpretation, after all, will be found to be to look to the nature and objects of the particular powers, duties and rights, with all the lights and aids of contemporary history, and to give to the words of each just such operation and force, consistent with their legitimate meaning, as may fairly secure and attain the ends proposed." Mr. Smith, in his Commentaries on Statutory and Constitutional Construction, § 491, says: "The reason of the statute—that is, the motives which led to the making of it, the object in contemplation at the time the Act was passed,—is another criterion by which to ascertain the true meaning of the Act." Again, he says, in the same section of his work: " When we once know the reason which alone determined the will of the law-makers, we ought to interpret and apply the words used in a manner suitable and consonant to that reason and as will be best calculated to effectuate the intent." See the same in Vattel, § 287.

Puffendorf remarks: " That which helps us most in the discovery of the true meaning of the law is the reason of it or the cause which moved the legislator to enact it." Cited in Potter's Dwarris on Stat., 133. Judge Potter, in his edition of Dwarris on Statutes and Constitutions, also quotes Mr. Rutherford's rule as to *circumstances* which may help to ascertain the meaning of ambiguous words and expressions. Mr. Rutherford divides these into three sorts, according to their connection with a law in origin, in place or in time.

In our own Courts we find the same doctrine in the case of *State* vs. *Stephenson*, (2 Bail., 334,) where Judge Johnson states the rule to be that "whatever may give certainty to a doubtful construction may be resorted to, no matter from what source it is derived, whether from a comparison of the various parts of the same Act or of different Acts on the same subject, the opinions of learned men or contemporary history." In the celebrated case of *The State* vs. *Carew*, in the Court of Errors, (13 Rich., 251, 253,) Chief Justice Dunkin ably supports the construction of the clause of the Federal Constitution protecting the obligation of contracts by the historical circumstances which gave rise to its adoption, and by the motives of the framers, as declared in the debates, and in the Federalist and other contemporary writings.

II. Having seen, therefore, that the object of *viva voce* voting in all elections by the Legislature, as prescribed in the Constitutions of 1865 and 1868, was to establish the full and complete responsibility of every member to his constituents, let us now take into consideration Article IV, Section 13, of the Constitution of 1868, which contains the following words, viz.: "The State shall be divided into convenient circuits, and for each circuit a Judge shall be elected by joint ballot of the General Assembly."

The conflict of opinion concerning the proper *mode* of electing Circuit Judges arises in the construction of the phrase "joint ballot" in the Section just above quoted.

1. This expression, "joint ballot," is to be taken in its popular sense, according to its common use. "The same word," says Mr. Story, "often possesses a technical and also a common sense meaning. In such a case the latter is to be preferred, unless some attendant circumstance points clearly to the former."—Story on Const., § 453.

"Every word employed in the Constitution is to be expounded in its plain, obvious and common sense meaning, unless the context furnishes some ground to control, qualify and enlarge it. Constitutions are not designed for metaphysical or logical subtleties, for niceties of expression, for critical propriety, for elaborate shades of meaning, or for the exercise of philosophical acuteness or judicial research. They are instruments of a practical nature, founded on the common business of life, adapted to common wants, designed for common use, and fitted for common understandings. The people make them; the people adopt them; the people must be sup-

posed to read them with the help of common sense, and cannot be presumed to admit in them any recondite meaning or any extraordinary gloss."—Story on Const., § 451.

" The proper signification of words is the signification which common usage has affixed to them." "The use of vulgar languages being, as every one knows, very arbitrary, etymological and grammatical investigations pursued with a view to discover the true import of a word in common usage would furnish but a vain theory, equally useless and destitute of proof."—Vattel's Law of Nations, Book II, Chapter XVII, §§ 271, 272.

. Puffendorf speaks to the same effect: "As for words, the rule is, unless there be reasonable objection against it, they are to be understood in the proper and most known signification—not so much according to grammar as to the general use of them."—Puffendorf's Rules, cited from Potter's Dwarris, 132.

Grotius has the following rule: "In cases that are not *odious* (*i. e.,* not against equity and right,) words are to be understood according to the full propriety of popular use; and if in popular use there be several significations of the same word, the largest is to be taken."—Grotius's Rules, cited from Potter's Dwarris, 133. Under this rule, a *generic* meaning should be attached to the phrase "joint ballot," rather than a *specific* meaning.

Even in regard to statutes, which are construed more rigidly than constitutions, the American rule is that " the popular or received import of words furnishes the general rule for the interpretation of statutes."—Potter's Dwarris, 143; *Maillard* vs. *Lawrence,* 16 How., 261. Dwarris states the English rule as to statutes, " that they are to be taken in their ordinary and familiar signification and import, and regard is to be had to their general and proper use; for *jus et norma loquendi* is governed by usage; and the meaning of words, spoken or written, ought to be allowed, as it has constantly been taken, ' *loquendum est ut vulgus.*' Even in the times of Queen Elizabeth, when Judges were accustomed to criticise words more narrowly than in the days of more liberal jurisprudence, it was held of a penal statute, in *Wigge's* case, (4 Rep., 46,) that the word 'attainted' should be construed to mean ' convicted,' the Judges saying that ' many times in common speech a person convicted is called a person attainted.' " And we find a striking illustration of this principle, in our own State, in the case of *Neeley* vs. *McFadden,* (2 S. C. R., 175, 177,) in which case it was held competent to prove

that the words "lawful money" in a contract meant "Confederate money" by the common understanding and usage of the community at the time of the contract. Another example is to be found in the discussion as to the meaning of the word "money" in *State*, ex rel. *Gary*, vs. *Parker*, (4 S. C. R., 230, note,) where it is held that "it must be taken in the ordinary sense understood by the community in their mutual dealings."

Let us now consider how far a technical definition is to prevail in interpretation of technical words.

Puffendorf confines technical interpretation to "terms of art, which are above the reach of the common people."—Puffendorf's Rules, cited in Potter's Dwarris, 132.

Vattel's rule is stated correctly but incompletely by Judge Potter, as follows: "Technical terms, or terms proper to the arts and sciences, ought *commonly* to be interpreted according to the definition given of them by masters of the art or persons versed in the knowledge of the art or science to which the term belongs."—Potter's Dwarris, 127. But Mr. Vattel proceeds to qualify this rule. He remarks of it: "I say *commonly*, for this rule is not so absolute but that we may, and even ought to, deviate from it, when we have good reasons for such deviation," and among the exceptions is any instance where it is proved that it was employed "in a vulgar acceptation." "If, however, the technical or other terms relate to things which admit of different degrees, we ought not scrupulously to adhere to definitions, but rather to take the terms in a sense agreeable to the context."—Vattel's Law of Nations, Book II, Chapter XVII, §§ 276, 277.

The Supreme Court of the United States, in the construction of the Constitution, has frequently refused to employ technical interpretation. In the case of *Gibbons* vs. *Ogden*, (9 Wheat., 188,) the word "commerce" was construed to comprehend "navigation" also, Chief Justice Marshall remarking: "The framers of the Constitution and the people who adopted it must be understood to have employed words in their natural sense and to have understood what they meant."

Mr. Cooley, in his Constitutional Limitations, p. 59, sums up this doctrine in these words: "Narrow and technical reasoning is misplaced when it is brought to bear upon an instrument framed by the people themselves for themselves, and designed as a chart upon

which every man, learned and unlearned, may be able to trace the leading principles of government."

2. It being evident, therefore, that the popular meaning of the words "joint ballot" ought to prevail over any technical definition, we interpret them, in Article IV, Section 13, to mean that the General Assembly should vote as a joint body and not in separate houses. For, in common usage, we find the word "ballot" applied as a *generic* term, denoting the "act of voting" as frequently as it is employed as a *specific* term, confined to one particular *mode* of voting; and in one lexicographer at least this use of the word "ballot" in a generic sense is recognized. Bouvier, in his Law Dictionary, after giving the specific meaning of "a little ball or a paper, &c.," adds, as a definition, "the act of giving votes." Common usage among parliamentarians and legislative bodies sanctions this definition. For instance, nothing is more common than to read or hear, among persons of education, as well as the unlearned, and from the lips and pens of politicians, statesmen, journalists, and, if your Honors please, from parliamentarians also, that in a convention or a caucus such a candidate was nominated on the first ballot, or such ballot as the case may have been, without intending thereby to indicate at all the *mode* of voting. We have heard again and again that at the National Republican Convention of 1876 Rutherford B. Hayes, of Ohio, was nominated as the Republican candidate for President on the eighth ballot, and yet the vote was taken *viva voce*. It is common to remark, after a State election, that the new Legislature of the State will be composed of so many Democrats and so many Republicans, giving the Democrats (or *vice versa*) a majority on joint ballot, thus securing the election of a United States Senator, and yet every well-informed person knows that a United States Senator must be elected *viva voce*, according to the Act of Congress.

Again, we observe a similar use of the word "ballot" to denote "the act of giving votes" in the Journal of the Convention of 1868, which framed the Constitution. In the record of the second day's proceedings, after a discussion of the merits of the respective modes of voting—"by ballot" and "*viva voce*"—we find the following:

"On motion of Mr. H. E. HAYNE, the motion to suspend the rules and vote by ballot was laid on the table."

\*     \*     \*     \*     \*     \*     \*     \*

"The Convention proceeded to vote *viva voce* for Assistant Sergeant-at-Arms, which resulted in the election of Mr. Peter L. Miller."

"In the same manner, after two ballots, Mr. Samuel Dickinson, of Charleston, was elected Doorkeeper, and Mr. John Fitzsimmons, of Columbia, Assistant Doorkeeper."—Jour. Conv. 1868, pp. 24, 25.

In the Journals of the Senate and House of Representatives, we find the same use of the word ballot to denote "the act of giving votes" in connection with *viva voce* voting. We quote some instances, viz.:

1. When Mr. Sawyer was elected United States Senator in July, 1868, we find the President of the Senate announcing "that the Joint Assembly would proceed to vote *viva voce* for a Senator in the Congress of the United States from South Carolina for the term," &c.

### "First Ballot."

[Here follow the names of candidates and their supporters.]

"No candidate having received a majority of the votes given, there was no election, and the Assembly proceeded to a second ballot."

[Here follow the votes, with names, &c., as before.]

"No candidate having received a majority of votes given, the Joint Assembly proceeded to a third ballot."

And so the House Journal continues, with the use of the word "ballot" in the sense of Bouvier's definition—"the act of giving votes"—up to the "eighth ballot," when Mr. Sawyer was elected.—House Journal, special session 1868, pp. 84, 85, 86, 87, 89, 91, 92, 93.

2. On the same election the Senate held five ballots on the first day before going into Joint Assembly. The voting was *viva voce* and names of voters were recorded. The words used in the Journal to designate the respective votings were: "First ballot," "second ballot," "third ballot," "fourth ballot," "fifth ballot."—Senate Journal, special session 1868, pp. 34, 35.

"The PRESIDENT announced, upon the result of the fifth ballot, that Mr. Frederick A. Sawyer had received a majority of the whole number of votes given in the Senate."—Senate Journal, special session 1868, p. 36.

Concerning the proceedings in Joint Assembly, there appear the words "first ballot," "second ballot," and so on, up to "eighth ballot," as in the Journal of the House.—Senate Journal, special session 1868, pp. 39, 40, 41, 42, 43, 45, 46, 47.

3. We find the same use of the word "ballot" concerning the election of Chief Justice and Associate Justices of the Supreme Court.—House Journal, special session 1868, pp. 132, 133, 135, 136, 140, 141, 143, 144; Senate Journal, special session 1868, pp. 93, 94, 95, 97, 99, 101, 103.

4. In the *viva voce* election of a Circuit Judge for the Sixth Circuit, *vice* Hon. George W. Williams, who declined the office, the same use of the phrases "first ballot," "second ballot," appears in House Journal, special session 1868, pp. 471, 472; and in Senate Journal, special session 1868, pp. 388, 390.

5. In the election of Trustees of the University, the word "ballot" again occurs to denote "the act of giving votes," and is applied to *viva voce* voting.—House Journal, 1868–69, pp. 492, 493; Senate Journal, 1868–69, pp. 432, 433.

6. On March 13, 1869, when the Senate and House were in Joint Assembly for the election of three Commissioners to revise and consolidate the statute laws,

"Mr. DONALDSON moved that the Joint Assembly proceed to vote *viva voce* for three Commissioners, simultaneously, on the first ballot."

"The PRESIDENT decided the motion out of order, the custom of the Joint Assembly being to elect separately.

"The Joint Assembly then proceeded to a

"FIRST BALLOT."

[Here follows the record of the votes, given *viva voce.*]

"The Joint Assembly then proceeded to a second ballot."

[Here follows the record of votes, given *viva voce,* as before.]

"The Joint Assembly then proceeded to a third ballot."—House Journal, 1868–69, pp. 543, 544; Senate Journal, 1868–69, pp. 465, 466, 467.

7. Of the election of United States Senator in 1870 we have the following record: [House Journal, pp. 57, 58, 62.]

" The House then proceeded to vote *viva voce*, with the following result on the

### " FIRST BALLOT."

[Here follow the names and votes of members, &c.]

" The House then proceeded to vote *viva voce*, with the following result on the

### "SECOND BALLOT."

\*     \*     \*     \*     \*     \*     \*     \*

" The Joint Assembly then proceeded to vote *viva voce*, with the following result on the *first ballot.*"

In the Senate Journal, December 6, 1870, the votings for United States Senator are similarly designated as " first ballot," " second ballot," and so on, up to " ninth ballot."—Senate Journal, 1870–71, pp. 78–81.

8. In regard to the election of Chaplain of the Senate, November 26, 1872, there were two ballots, the votes being each time given *viva voce*. The Journal relates (p. 10) : " The Senate proceeded to a second ballot for a Chaplain of the Senate."

9. The phrases " first ballot," " second ballot," are found in Senate Journal, 1872–73, pp. 94, 95, concerning the election of Hon. J. J. Patterson to the Senate of the United States ; also, the following :

" Mr. NASH desired the decision of the President as to the right and legality of the Senate proceeding to a second ballot on this day under the Act of Congress as read to the Senate.

" The PRESIDENT ruled that the Senate may proceed and continue to ballot, in the event of no person receiving a majority, until midnight, unless interrupted by adjournment.

" The Senate proceeded, *viva voce*, to a *second ballot.*"

10. Even in the present session of the General Assembly, with the fact of the present discussion as to the meaning of the phrase " joint ballot," we find in the Calendar of the House of Representatives for December 5, 1877, the following :

### "SPECIAL ORDER FOR 1 O'CLOCK P. M.

" Joint ballot for Judge of Seventh Circuit.

" Joint ballot for Register of Mesne Conveyance for Charleston County.

"Joint ballot for Attorney General."

Thus showing that the language of the people, adopted by them in common use, refuses to be bound by the shackles of a narrow and rigid interpretation.

III. But we have dwelt, perhaps, too much at length upon the definitions of the word "ballot" and of the phrase "joint ballot." "*Qui hæret in litera hæret in cortice.*" Chief Justice Marshall, in *Cherokee Nation* vs. *Georgia,* (5 Peters, 19,) says: "The most important rule in cases of this nature is that a constitution of government does not, and cannot from its nature, depend in any great degree upon mere verbal criticism or upon the import of single words. Such criticism may not be wholly without use; it may sometimes illustrate or unfold the appropriate sense, but unless it stands well with the context and subject matter it must yield to the latter. While, then, we may well resort to the meaning of single words to assist our inquiries, we should never forget that it is an instrument of government that we are to construe; and, as has been already stated, *that* must be its truest exposition which best harmonizes with its design, its objects and its general structure."

Mr. Story, in his work on the Constitution, § 454, says: "It does not follow, either logically or grammatically, that because a word is found in one connection in the Constitution with a definite sense, therefore the same sense is to be adopted in every other connection in which it occurs. This would be to suppose that the framers weighed only the force of single words, as philologists or critics, and not whole clauses and objects, as statesmen and practical reasoners. Men of ingenious and subtle minds, who seek for symmetry and harmony in language, having found in the Constitution a word used in some sense which falls in with their favorite theory of interpreting it, have made that the standard to measure its use in every other part of the instrument. They have thus stretched it, as it were, on the bed of Procrustes," &c.

Says Vattel: "The consideration of the reason of a law or promise not only serves to explain the obscure and ambiguous expressions which occur in the piece, but also to extend or restrict its several provisions independently of the expressions, and in conformity to the intention and views of the Legislature or the contracting parties, rather than to their words."—Law of Nations, Book II, Chapter XVII, § 290.

As to statutes, Potter's American Rules on this subject are as follows:

"Statutes must be interpreted according to the intent and meaning, and not always according to the letter."

"A thing within the intention is within the statute though not within the letter; and a thing within the letter is not within the statute unless within the intention."—Potter's Dwarris, 144, and cases there cited.

"The intent of the Legislature is not to be collected from any particular expression, but from a general view of the whole of an Act of Parliament."—Potter's Dwarris, 193.

"In construing Acts of Parliament," says Lord Tenterden, 7 B. & C., 643, "Judges are to look at the language of the whole Act; and if they find in any particular clause an expression not so large and extensive in its import as those used in other parts of the Act, and upon a view of the whole Act they can collect from the more large and extensive expressions used in other parts the real intention of the Legislature, it is their duty to give effect to the larger expressions."—*Ibid*, 194.

"Sometimes, when the words of a statute are obscure, the intention of the Legislature is to be collected from the cause and necessity of the statute, and sometimes from other circumstances; and whenever it can be discovered it ought to be followed with reason and discretion in the interpretation, although such interpretation seem contrary to the strict letter of the statute."—*People* vs. *Utica Insurance Company*, 15 Johns., 358.

Applying these rules to the Constitution as a whole, we find the "more large and extensive expression" to be in Article II, Section 24: "In ALL elections by the General Assembly, or either house thereof, the members shall vote *viva voce;* and their votes, thus given, shall be entered upon the journal," &c. Here is the intent, collected from a "general view" of the whole Constitution. We have already seen that the "design" and "object" of this Section is to insure full responsibility of the representative to the people. When we construe the expression "joint ballot" in Article IV, Section 13, in the light of the context, can we, in the face of all these rules, narrow its meaning down to a secret vote?

What is the "design," what are the "objects," of this Section? Let us repeat it:

"Section 13. The State shall be divided into convenient circuits, and for each circuit a Judge shall be elected by joint ballot of the General Assembly, who shall hold his office for a term of four years, and during his continuance in office he shall reside in the circuit of which he is Judge."

The "design" is, first, to provide for a subdivision of the State into judicial territories; secondly, that each territory should have a Judge who should be resident therein; thirdly, that each Judge should be elected by the General Assembly, voting as a joint body, and not in separate houses; and, fourthly, that the term of office should be four years.

It was not necessary that the *mode* of his election should be designated, for the *mode* of "ALL elections by the General Assembly" had been already prescribed in Article II, Section 24. And it may not be amiss to remark that in no instance of any judicial or executive officer does the Constitution prescribe the *mode* of his election, except under the general provisions of Article VIII, Section 1, as to popular elections, and of Article II, Section 24, as to legislative elections, both of which are expressed in terms denoting universal application.

IV. But let us leave the instrument itself, and again recur to the light of its history. We have already examined into the temper and tendencies of the framers and their constituents; let us now notice the proceedings of the Convention of 1868 in reference to Article IV, Section 13: "When the inquiry is directed to the mischief designed to be remedied, or the purpose sought to be accomplished by a particular provision, it may be proper to examine the proceedings of the Convention which framed the instrument."— Cooley Const. Lim., 66, and cases cited.

The article on the judicial department of the Constitution came before the Convention on its second reading, on February 26, 1868, and the debates are fully reported in the Journal, pp. 595 *et passim*. The professional stenographer who kept the record was officially employed by the Convention. It appears that the question principally discussed concerning the Judges of the Circuit Courts was who should elect them.

The Section now under consideration was reported by the Committee, with the words "for each circuit a Judge shall be elected by the qualified electors thereof."—Jour. Conv. 1868, p. 617.

Mr. C. M. Wilder moved to strike out the words "qualified electors" and to insert the words "by joint vote of the General Assembly."

The debate was quite animated, Messrs. J. J. Wright, C. C. Bowen and D. H. Chamberlain leading the debate in favor of the election of Circuit Judges by the people, and Messrs. C. P. Leslie, E. W. M. Mackey, W. B. Nash and others advocating their election by the General Assembly. Mr. Mackey in his argument on the subject alludes to that principle of the Constitution which insured legislative responsibility to the people in the following terms: "The members of the Legislature are sufficiently responsible to the people for their action, and if they elect an incompetent or corrupt Judge the people will take care that those men shall never again take their seats in the General Assembly."

After the debate, the result was the adoption of Mr. Wilder's amendment by a vote of 65 to 24.—Jour. Conv. 1868, pp. 617–621.

According to this action of the Convention, the Section should have been engrossed for a third reading with the words "and for each circuit a Judge shall be elected by joint vote of the General Assembly."

It was never afterwards altered or amended in the Convention, but we next find the Section before the Convention when the Constitution, as a whole, came up for a third reading; and then, for the first time, we discover the words "joint ballot," instead of "joint vote." Article IV was read by Sections and passed for ratification without any comment or debate, save that notice was given of an additional Section concerning slave debts.—Jour. Conv. 1868, pp. 854–858.

Now, we submit that the intention of the framers of the Constitution was to preserve the responsibility of the General Assembly to the people in this election as in all others; that no intimation was given, in debate or otherwise, of any disposition to make the *mode* of election of Circuit Judges an exception to the universal rule adopted in Article II, Section 24; that the Convention, being presumed to act intelligently, and to recognize the principle laid down by Chief Justice Marshall in *Craig* vs. *Missouri* (4 Pet., 437,) that a "constitution deals with things, not names," adopted the expression "joint ballot of the General Assembly" as meaning the same as "joint vote of the General Assembly;" and, further, we submit, and we think we have already clearly demonstrated, that

the two expressions may be taken as synonymous with full regard to all the rules of constitutional interpretation.

V. And now we come to consider the contemporaneous and practical construction of the Constitution in this particular. The people ratified and adopted the Constitution on the 14th, 15th and 16th days of April, 1868, and at the same election, upon the same ticket, voted for members of the General Assembly.—Ordinances Conv. 1868, Gen. Stat., 55. The General Assembly thus elected was composed largely of members and attachees of the Convention. By a comparison of the rolls of the Convention and of the General Assembly, it will be seen that sixty members of the Convention were elected members of the Legislature—seventeen as Senators and forty-three as Representatives. One of the duties of that General Assembly was to elect Circuit Judges. How did they elect them? They elected them in joint assembly, the members voting *viva voce,* and the names of members and their votes being recorded in the journals. And thus has election after election of Circuit Judges proceeded, without a question or a doubt as to the propriety or legality of the *mode,* up to 1877. Judges elected *viva voce* took the oath of office and went upon the bench to construe and administer the Constitution and the laws. Astute constitutional lawyers, hostile to the new system and ready at all times to expose and take advantage of any mistakes in its practical workings, appeared before those Judges and argued important causes, involving life, liberty and property, without expressing a single doubt as to the constitutionality of their election in this particular, until the case of *Whipper* vs. *Reed,* lately before this Court. And the same Legislature, which adopted during the present year a different *mode* of election, did so with hesitation, and evinced their doubts on the subject by passing the resolution in compliance with which this cause is now brought before your Honors for adjudication.

Strong as all this appears of itself, let us read it with the assistance of authority.

The Court of Errors, in the *State* vs. *Carew,* (13 Rich., 521–523,) and again in *Barry* vs. *Iseman,* (14 Rich., 138,) expounds the Constitution of the United States by the testimony of its framers; and in the latter case, Judge Munro, who delivered the opinion of the Court, supports the exposition of the clause under consideration by reference to an ordinance passed in 1787 by the old Congress,

"most of the members of which were also members of the Convention that framed the Constitution."

Chief Justice Marshall, in *Cohens* vs. *Virginia*, (6 Wheat., 418,) says: "Great weight has always been attached, and rightly attached, to contemporaneous exposition;" and, after citing the Federalist as a commentary on the Constitution and the Judiciary Act, he remarks, in favor of the constitutionality of the latter: "We know that in the Congress which passed the Act were many eminent members of the Convention which framed the Constitution."

Judge Story, in *Martin* vs. *Hunter's Lessee*, (1 Wheat., 351, 352,) announces the same doctrine in terms equally emphatic.

In *Union Insurance Company* vs. *Hoge*, (21 How., 66,) Judge Nelson, on the question whether the company had complied with the insurance law of New York, decides in accordance with "the practical construction of the Act of 1849 by the public officers of the State."

In *Surgett* vs. *Lapice*, (8 H.,) Judge Catron construes the Act of Congress of 1832 concerning public lands and remarks: "The foregoing construction being the one adopted by the Department of Public Lands soon after the Act of 1832 went into operation, we should feel ourselves constrained, unless the error was plainly manifest, from disturbing the practice prescribed by the Commissioner of the General Land Office," &c.

In *Cooley* vs. *Board of Wardens of Port of Philadelphia*, (12 H., 315,) Judge Curtis says, concerning the constitutionality of the Pennsylvania pilotage laws: "This contemporary construction of the Constitution, since acted on with such uniformity in a matter of great public interest and importance, is entitled to great weight."

Judge Thompson, in the *Bank of the United States* vs. *Halstead*, (10 Wheat., 62, 63,) says: "If any doubt existed whether the Act of 1792 vests such power in the Courts, or with respect to its constitutionality, the practical construction heretofore given to it ought to have great weight in determining both questions. It is understood that it has been the general, if not universal, practice," &c.

In *Edward's Lessee* vs. *Darby*, (12 Wheat., 210,) Judge Trimble states: "In the construction of a doubtful or ambiguous law, the contemporaneous construction of those who were called upon to act

under the law and were appointed to carry its provisions into effect is entitled to very great respect."

Judge Johnson, in the great case of *Ogden* vs. *Saunders*, (12 Wheat., 290,) reasons as follows: "The contemporaries of the Constitution have claims to our deference on the question of right, because they had the best opportunities of informing themselves of the understanding of the framers of the Constitution and of the sense put upon it by the people when it was adopted by them."

But the leading case on the subject of contemporary construction, cited as such by eminent writers on constitutional law in this country, and frequently affirmed in the Courts, is *Stewart* vs. *Laird*, 1 Cranch, 309, which was decided by the Supreme Court of the United States in February, 1803, a few years after the adoption of the Federal Constitution. The question was concerning the right of the Judges of the Supreme Court to hold Circuit Courts, and it was contended that the Supreme Court Judges, having been appointed and commissioned for that Court only, could not sit on the bench of an inferior Court. The language of Judge Patterson, in delivering the opinion of the Court, is: "To this objection, which is of recent date, it is sufficient to observe that practice and acquiescence under it for a period of several years, commencing with the organization of the judicial system, affords an irresistible answer and has indeed fixed the construction. It is a contemporary exposition of the most forcible nature. This practical exposition is too strong and obstinate to be controlled." We cannot imagine a case that could be more like the present than this. To the objection that Judges had no right to sit in certain Courts, the answer that Judges have been sitting there without question for several years is "irresistible." To the same objection now the answer is given in the same terms.

VI. We submit, therefore, that we have established:

*First.* That the phrase "joint ballot" is capable of two interpretations, viz.:

1. A strict and technical one, applying it to the *mode* of voting, to denote a secret vote.

2. A general and popular one, which embraces all elections held by two bodies voting jointly, without regard to the *mode* of voting.

*Second.* That this phrase in Article IV, Section 13, is to be construed according to its popular use, because—

1. Other things being equal, the popular meaning prevails over the technical meaning.

2. The people adopted and ratified the Constitution.

3. It is the larger sense of the phrase.

4. It is the only construction consistent with the "design, objects and general structure" of the Constitution.

5. It is supported by contemporaneous exposition, and the practice of the first General Assembly, which was largely composed of the framers of the Constitution of 1868.

6. It has been adhered to by the Legislature and State officers, and the Judges have acted under it, without question or challenge, up to April, 1877.

*Third.* That, whatever the literal meaning of this phrase, the Constitution, as a whole, demands that the General Assembly shall always elect *viva voce*, and the general tenor must prevail.

VII. And now, in conclusion, let us cite a regulation from an ancient and venerable authority: "It is a rule," says Lord Bacon, in his Maxims, (*Reg.*, 10,) "that the King's grants shall not be taken or construed to a special intent." Our sovereign is the people; their grant is our fundamental law. By the Constitution they have confided in the Legislature important trusts, but they have coupled those trusts with a full and complete accountability of their agents to themselves. They have retained the right to know all the official acts of their representatives; and they have, for greater certainty, declared in the preamble to their grant that "the enumeration of rights in this Constitution shall not be construed to impair or deny others retained by the people, and all powers not herein delegated remain with the people."—Article I, Section 41. Has the Legislature any right to exceed the powers thus bestowed upon them? And when they are instructed to exercise their delegated powers in a particular way, can they exercise them in another way, less favorable to the grantor, without being guilty of usurpation?

Let us, therefore, maintain the integrity of the fundamental law, construed according to the maxims of popular government venerated and upheld by our fathers in the best days of the republic. And, in reading its language, let us remember that "the language of the country," as one of our Judges has said, "is the coinage of the whole people." The words of the Constitution were coined in the people's mint and their authority has given them currency. The only proper device to be stamped upon them is the image of

their sovereign. We cannot substitute for that image the profile of a Webster or of a Walker or of any other etymologist. Neither can we impress upon them any stamp of temporary expediency without rendering them counterfeit. The "image and superscription" are Cæsar's; let us, therefore, "render unto Cæsar the things that are Cæsar's."

*Points and Authorities by Robert Aldrich, of counsel for State:*

Article II, Section 24, Constitution of South Carolina: "That in all elections by the General Assembly, or either house thereof, the members shall vote *viva voce,* and their votes thus given shall be entered upon the journal of the house to which they respectively belong."

This Article relates to the legislative department, and this provision is *the rule* by which the General Assembly are to be governed in the matter of elections *generally.*

Article IV, Section 2: "They (Justices of the Supreme Court) shall be elected by a *joint vote* of the General Assembly."

A joint vote *by ballot* would be a joint vote; and if this Article stood alone its requirements would be fulfilled either by a joint vote by ballot or a joint vote *viva voce.* Why, then, may not the Legislature elect Justices of the Supreme Court by ballot? It is because the special provision in this Article must be construed *in pari materia* with the general provision contained in Article II, Section 24; and harmony being the prime object in statutory construction, this is obtained by giving such a construction to the words *joint vote* as will bring them under the general rule laid down in Article II, which requires all the elections by General Assembly to be *viva voce.*

Article IV, Section 13: "And for each Circuit a Judge shall be elected by *joint ballot* of the General Assembly."

If this Section of this Article stood alone, no question could arise as to the construction to be given to it, and the mode of voting would be by ballot. How is it varied by construing it *in pari materia* with the provision contained in Section 24 of Article II ? They are in direct conflict. One commands *viva voce;* the other commands *ballot.*

A rule is, in case of a conflict, a special provision will control a general. The special provision is ballot; the general is *viva voce.* By this rule the ballot would prevail.

Another rule is, that when a conflict arises in the terms of a constitution or statute, the latter will control the former. *Viva voce* is the former; ballot is the latter. So by this rule the ballot would prevail.

Another highly favored rule of construction is, that such a construction should always be given as will preserve all the parts of the instrument, giving force and effect to all, destroying none. To hold that the Judges of the Circuits shall be elected by a *viva voce* vote, in deference to the provisions of Section 24, Article II, is to *destroy* the provision of Article IV, Section 13. To hold that all elections by the General Assembly shall be *viva voce, except* elections for Circuit Judges, is to give effect to all parts of the instrument—preserving all, destroying none.

The reason is asked for this difference in the mode of voting. It is sufficient that it is commanded by the fundamental law to be obeyed. There is a great underlying reason, however, for the requirement—*protection* to the voter; protection to those represented by the voter. *Protection* is the first aim of government; the second is purity in the public service. It is not strange that in a constitution of government, protection and purity should be guarded.

If, then, by all the considerations we are at liberty to indulge, we conclude that Circuit Judges are required to be elected by joint ballot, is an election by joint vote *viva voce* a valid election? Try it by the Constitution.

Article VII, Section 1: "In all elections the electors shall vote by *ballot.*" What would the *viva voce* vote of an elector at the polls for Governor be worth, though it were entered on the poll lists by the managers? If worthless in South Carolina, why is it? [It would be good in Kentucky.] Because the Constitution of South Carolina requires it to be by ballot.

What would the title of a Governor thus elected be worth? If nothing, why? Because he would have been elected in a manner different from that required by the Constitution. Construe this provision *in pari materia* with the former.

Questions have arisen as to what really was intended to be put in the Constitution by its framers. The Constitution is that which was *ratified* by the people. The Constitution which all are sworn to support, protect and defend is that which was *ratified* on the 14th, 15th and 16th days of April, A. D. 1868,

To arrive at a just construction of the Constitution, let us ascertain the meaning, critically, of "vote" and "ballot." They are sometimes used in the same sense, but they are different.

Walker defines "ballot," "a little ball or ticket used in giving votes; the act of voting by ballot." "Vote," he says, is suffrage voice given and numbered. Webster: "*Ballot* is a ball used in voting, or a piece of paper or other thing used for the same purpose; the whole amount of votes cast."

*Vote* is to express or signify the mind, will or preference, either *viva voce* or by ballot, or other authorized means, as in electing men to office.

Locke on the Human Understanding, Book IV, Chapter XX: "How many men have no other ground for their tenets than the supposed honesty or learning or number of those of the same profession? as if honest or bookish men could not err, or truth were to be established by the *vote* of the multitude!"

Wharton's Law Dictionary: "Ballot" is to vote for or choose a person into an office by means of little balls of several colors, which are put into a box *privately*, according to the inclinations of the chooser or voter, or by writing the names of the candidates upon small pieces of paper, and *rolling them up so that they cannot be read*, which are put into a box, and, when the time limited for an election is over, an indifferent person takes them out one by one, and, upon reading the name or names, somebody takes down the number of votes, the greater of which is declared duly elected.

Cush. Leg. Assemb., Section 103: "A ballot" may be defined to be a piece of paper, or other suitable material, with the name written or printed upon it of the person to be voted for; and when the suffrages are given in this form, each of the electors, in person, deposits such a vote in a box or other receptacle provided for the purpose and kept in the custody of the proper officers.

Bouvier's Law Dictionary: "Ballot," a diminutive ball, *i. e.*, a little ball used in giving votes; the act itself of giving votes; a little ball or ticket used in voting privately, and for that purpose put into a box (commonly called a ballot-box) or some other contrivance.

These authorities fully establish and define the technical meaning of the word "ballot." The next question which arises is: whether this technical signification is to be adopted in the construction of our Constitution, or some loose and popular understanding

of the term " ballot," such as being a synonym for the word "vote." Now, it is a well-established principle in the construction of statutes that wherever a word has received a technical and distinctive signification by usage that signification must prevail in the interpretation, in opposition to any loose or general definition of the same. We come, then, to consider this term " ballot " in connection with its parliamentary history and the practical acceptation of the term by legislative bodies in this State from the Revolutionary period to the present day ; for by such history and usage we will be enabled to ascertain the true meaning of the terms.

By the State Constitution, (19th March, 1778,) Section 18 :

The Senate and House of Representatives shall each choose their respective officers *by ballot*, without control.

SEC. 22. Delegates to Congress to be elected *jointly by ballot* in the House of Representatives.

SEC. 24. Ordinaries for the several Districts shall be chosen by the Senate and House of Representatives *jointly by ballot.*

SEC. 27. Judicial officers shall be chosen *by ballot jointly* by the Senate and House of Representatives.

SEC. 29. The two Commissioners of the Treasury, the Secretary of State, &c., shall be chosen, in like manner, *jointly by ballot.*

SEC. 30. All officers of the army and navy of the State above the rank of Captain shall be chosen by the Senate and House of Representatives *jointly by ballot.*

### CONSTITUTION OF 1790.

Article I, Section 12 : Each house shall choose, *by ballot,* its own officers, &c.

Article II, Section 1 : The Senate and House of Representatives shall *jointly, in the House of Representatives, choose, by ballot, a Governor.*

Article VI, Section 1 : The Judges of the Supreme Court, &c., shall be elected by the *joint ballot* of both houses, in the House of Representatives.

5 Stat., 202, Act of 1792, Sub. 1 : Electors of President and Vice President shall be appointed *by ballot* * * * in the House of Representatives * * * by the Legislature of the State.

5 Stat., 361, Act of 1792, Section 9 : Comptroller General shall be elected by *joint ballot* of both branches of the Legislature of this State.

5 Stat., 674, Act of 1812, Section 1: Attorney General and others elected by *joint ballot* of both houses of the Legislature.

5 Stat., 674, Act of 1812, Section 2: That in all *joint ballots* for the officers before mentioned a majority of all the *votes* given on such *joint ballot* shall be necessary to constitute an election.

Act of 1784, Section 2: Court of Chancery to consist of three Judges, to be chosen by *joint ballot* of the Senate and House of Representatives.

8 Stat., 25, Act of 1812. Bank of the State. Section 7: Legislature shall proceed to elect, by *joint ballot*, a President and twelve Directors.

12 Stat., 647, Act of 1859. Separate Court of Appeals:

SECTION 1. Chief Justice and two Judges, to be styled Judges of the Court of Appeals, to be chosen by *joint ballot* of the Legislature among the Chancellors and Judges now in commission.

It will thus appear, that from the period of the State's first existence as a sovereignty to the termination of the late civil war all elections in the General Assembly were determined *by ballot;* and the universal practice of balloting in the legislative bodies on such occasions, we assert as a matter of fact, was in accordance with the legal and technical definitions already furnished. It will, moreover, appear from the above quotations that the terms *"jointly by ballot,"* *"by ballot jointly"* and *"joint ballot"* are, in parliamentary language, interchangeable terms, applied without distinction to the composition of the electoral body and the particular mode of effecting a result "necessary to constitute an election."

Such, then, being the time-honored parliamentary signification of the term *"joint ballot"* and its cognate expressions, it behooves both the judiciary and the Legislature to receive it according to its accepted and technical meaning, as, indeed, it was received in the late election of Judge Kershaw; for " words and phrases the meaning of which in a statute (*a fortiori* in a Constitution) has been ascertained are, when used in a subsequent statute, to be understood in the same sense."—Potter's Dwarris, 274.

Leave out Section 21 of Article II of our present Constitution, and the modes of electing, respectively, the Justices of the Supreme Court and the Circuit Judges, the former by *"joint vote"* and the latter by *"joint ballot"* of the General Assembly, would be too apparent to admit of discussion. Does, then, this general provision that all elections by the General Assembly shall be *"viva voce"* so

overshadow the special and express provision with regard to the mode of electing Circuit Judges that we must go counter to the recognized meaning of language and do violence to the Constitution itself? Certainly not. It has been laid down as an established rule in constitutional interpretation that when a special provision conflicts with a general, the former must be treated as an exception to the latter, as much so as if the words in the general provision had been followed with "*save as hereinafter provided*," so that we must read the 21st Section of Article II as if the words "*viva voce*" were followed by "*save. as hereinafter provided in Article IV, Section* 13, *of this Constitution*."—Potter's Dwarris, 117, 272, 273.

Thus, then, is harmony restored to the Constitution, yet no violence done to its letter or to its spirit. Without undue straining of terms from their received signification, without any labored exhibition of grammatical ingenuity, without the aid of metaphysical refinement, we have by this "saving" rule the plain meaning of the words and intent of the Constitution maintained.

We have thus far endeavored to show that the election of Circuit Judges by a *viva voce* vote of both houses is contrary to express constitutional requirement. In support of that view we have established the parliamentarary signification of the words "*ballot*," "*jointly by ballot*," "*by ballot jointly*" and "*joint ballot*." We have shown the unvarying custom of election by ballot from the Revolution to the times of reconstruction, and the necessity of giving effect to the mode by ballot in the election of the Circuit Judges, in order to harmonize the Constitution without doing violence to its express provisions.

Can a vote *viva voce* and a vote by ballot be by any construction, however forced, made to mean the same thing or things equivalent?

*Viva voce*, involves verbal utterance.

Ballot, involves silence.

*Viva voce*, involves sound.

Ballot, involves quiet.

*Viva voce*, involves publicity.

Ballot, implies secrecy.

Can two things be more opposite in their meaning? When the fundamental law uses words of a diametrically opposite sense as to the *mode* of performing the same act on different occasions, can it

be said that it means the same mode on both occasions? Can it be said that the instrument is indifferent as to the mode?

If the two modes are different in the law, is making them the same lawful?

The underlying reasons for requiring Circuit Judges to be elected differently from other officers and differently from the Supreme Court Judges:

The Justices of the Supreme Court are supposed to be chosen from a class beyond the reach of personal influence.

They are a few and hold for a longer term.

They come less in contact with the bar, and not at all with the people.

They are a Court for the correction of errors of law and to hear and determine appeals, and have little or no discretionary power.

The Circuit Judges are elected for a shorter term and are more numerous. They come in daily contact with the bar, the people and their representatives. They have vast discretionary powers, to be employed justly, but which may be employed to reward friends and to punish opponents.

For these reasons the Constitution requires a different mode of election, (by ballot,) so that the elector may exercise his unbiased, unfettered choice for the one his conscience and his judgment tell him will make the best Judge, regardless of the consequences which might attach to his voting against the successful candidate.

If, then, these plain requirements are disregarded, and a different mode is adopted,—one that deprives the elector of his freedom, one that enabled party leaders on one memorable occasion to force weak and timid legislators to vote for men they knew to be unworthy,—is it a legal election? If the Constitution is violated, is the act lawful?

Chief Justice Davis, in *People* vs. *Pease*, (27 N. Y., 81,) speaking of the ballot, which he styles " an important and valuable safeguard of the independence of the humble citizen," says :

" The spirit of the system requires that the elector should be secured then, and at all times thereafter, against reproach or animadversion or any other prejudice on account of having voted according to his own unbiased judgment; and that security is made to consist in shutting up within the privacy of his own mind all knowledge of the manner in which he has bestowed his suffrage."

Mr. Cooley expresses himself in similar terms.—Cooley's Con. Lim., p. 604.

Some say, what practical difference does it make? The same may be asked about any other provision of the Constitution where men differ in opinion upon questions of policy. The answer is, the Constitution requires it, and that is enough.

The Constitution is divided into separate Articles, each Article relating to a different subject. The second Article relates to the legislative department, and the 24th Section provides: "That in all elections by the General Assembly, or either house thereof, the members shall vote *viva voce*, and their votes thus given shall be entered upon the journal of the house to which they respectively belong." From this it is clear that all elections by the General Assembly, as a general rule, are to be *viva voce;* and if nothing more had been said, the *viva voce* of the Circuit Judges would unquestionably be constitutional. But, as a constitution or an Act is to be construed together, we must take all the parts of either to arrive at a correct conclusion. Coming, then, to the fourth Article, Section 2, which relates to the judicial department, separate and distinct from the legislative, and subsequent from it, we find the following provision as to the election of Justices of the Supreme Court: "They shall be elected by a *joint vote* of the General Assembly." And, further on, in the same Article, Section 13, providing for the election of Circuit Judges, we find the following provision: "And for each circuit a Judge shall be elected by *joint ballot* of the General Assembly." Pursuing our inquiry in Article VII, Section 1, which relates to the right of suffrage, we find, further, that "in all elections the electors shall vote by *ballot.*" These are all the provisions in the Constitution which relate to the mode of voting. In the legislative department the members shall vote *viva voce* in all elections; in the judicial department the Justices of the Supreme Court shall be elected by a *joint vote*, and the Circuit Judges by a *joint ballot* of the General Assembly.

In elections by the people the vote shall be by *ballot*. Thus, it will be perceived, there are four modes of election prescribed by the Constitution—*viva voce, joint vote, joint ballot* and *ballot*. The first is a general provision; the other three relate to particular elections. If the second Article is to control the construction, the provisions of the fourth Article are surplusage and should not have been put in. To arrive at a just construction of the Constitution, it is neces-

sary to ascertain the correct meaning of the expressions *vote* and *ballot*. They are sometimes used in the same sense, but, critically speaking, the words do not mean the same thing. Walker defines *ballot* "a little ball or ticket used in giving votes; the act of voting by ballot." *Vote,* he says, is "suffrage *voice* given and numbered." And so Webster: *ballot* is "a ball used in voting, or a piece of paper or other thing used for the same purpose; the whole amount of votes cast." *Vote,* is "to express or signify the mind, will or preference, either *viva voce* or by ballot, or other authorized means, as in electing men to office." And Richardson, in one of his illustrations, quotes from "Locke on the Human Understanding," b. 4, Chapter XX: "How many men have no other ground for their tenets than the supposed honesty or learning or number of those of the same profession? as if honest or bookish men could not err, or truth were to be established by the *vote* of the multitude."

From all this, it seems that vote is a noun of multitude, and the vote is ascertained by counting the ballots or the *viva voce* responses. The words are not synonymous. *Ballot* means the expression of the will of the voter by a ball or a piece of paper. *Vote* means the aggregate expression of all the voters, whether indicated by a ball, a piece of paper, or *viva voce;* and that they are not used in the fourth Article of the Constitution as correlative terms is apparent from the use of them in this Article in juxtaposition. Thus, in the second Section, it is declared the Justices of the Supreme Court shall be elected by a *joint vote*, which may be either by *ballot* or *viva voce;* and immediately after, in the thirteenth Section, on the same page, it is provided the Circuit Judges shall be elected by a *joint ballot*, which can only be by writing or printing the name of the person voted for on a piece of paper. Now, can it be contended that the framers of the Constitution used these expressions to mean the same mode of voting, or did they have a design in providing different modes? It was not an accident, nor was it careless expression; for in Article VII, Section 1, it is provided that "in all elections by the people the electors shall vote by *ballot*." This proves conclusively that the different expressions of the mode of voting were used by the Convention designedly; they intended to distinguish between the vote by *ballot* and the vote *viva voce*. Will any one contend for a *viva voce* vote when the Constitution commands the vote to be by *ballot?* And there was a sufficient reason for prescribing a different mode. The Justices of the Supreme

Court were to be elected for the whole State and for a longer term, while the Judges of the Circuit Court were to be elected for a circuit and shorter term. It was also ordained that they should interchange circuits as provided by law, yet it might happen that the Legislature would not make that provision, as they did not until the last session. So, in order to prevent any prejudice that might influence the mind of a Circuit Judge by knowing that a man of influence, a suitor in his Court, had supported or opposed his election, the Constitution designedly provided that the election of these Judges shall be by *ballot*. Can anything be more clear? A ballot cannot be a *viva voce* vote, because the former implies secrecy, while the latter commands verbal utterance. Therefore it must have been used advisedly, and, as just stated, a sufficient reason did exist.

It may be laid down as a general proposition in the construction of constitutions and statutes, that when the first and the succeeding clauses are inconsistent the latter controls the former. If this be true, (and it will hardly be disputed,) the argument is concluded; for although the expressions *viva voce* and *joint vote* may be considered synonymous, there can be no doubt as to the meaning of *ballot*. When an elector is directed to vote by *ballot*, there is no escaping the duty to be performed; he must express his preference either by a ball or on a piece of paper deposited in a box or other receptacle, and the majority of the *ballots* thus deposited is the vote that determines the election. And so, when the election is *viva voce*, the majority of audible expressions is the vote that determines the election. And again, when the election is by *joint vote*, the choice of the electors may be expressed by the audible announcement of their choice or the silent evidence of their will as indicated by the ball or the piece of paper. In other words, the vote is the aggregation of the verbal announcements made or the written ballots deposited. For although, in common parlance, vote and ballot may be used as convertible terms, yet when they are used in a Constitution or in the same Act, directing how the Justices of the Supreme Court and the Judges of the Circuit Court shall be elected, we are forced to ascertain the critical meaning of the words used, to determine what was the intention of the framers of the Constitution. If, then, the expressions *joint vote* and *joint ballot* mean different modes of election, we cannot escape the conclusion that the election of the Circuit Judges, except of the Fifth Circuit, is

unconstitutional and void, the others having been elected *viva voce* and not by *joint ballot* as required by the Constitution.

It has been suggested that the use of the word "ballot" instead of "vote," as to the election of Circuit Judges, is a clerical error, and that the inexperience and ignorance of the members of the Convention did not enable them to detect it; also, that this is probable, as there is no mention of an amendment in the journal—the original draft being *vote*. It appears to us that the suggestion is without force. Dr. Mackey, the President of the Convention, a forcible and perspicuous writer, was accustomed to preside over deliberative assemblies, and his works show that he understands the use of words. Mr. Chamberlain, a lawyer of ability and a man of high literary culture; Mr. Corbin and Mr. Leslie, both lawyers and certainly astute men; Judge Wright, an Associate Justice of the Supreme Court, and many others, of more or less culture and attainment, were members of the Convention. It is hardly to be supposed that so important a change in the organic law would have escaped their notice, or of the Committee whose duty it was to revise and engross the Constitution before it was adopted. But even if such an error had been made by the Engrossing Clerk and over-looked by the Engrossing Committee, as well as the professional and educated men of the Convention, it cannot be corrected either by the Supreme Court or the Legislature, for the Convention passed an ordinance "to provide for the ratification of the Constitution," which was submitted, as it now reads, to the registered voters of the State on the 14th, 15th and 16th days of April, 1868, and by them ratified; so that if there was a clerical error, it was embodied in the Constitution adopted by the Convention, ratified by the people, and the only way to correct it is in the mode and manner prescribed by the Constitution itself in Article XV. It would be a gross usurpation, either by the Courts or the Legislature, to override and change this Article of the fundamental law.

January 22, 1878. The Judges delivered their opinions, *seriatim*, as follows:

HASKELL, A. J. The question in this case is of the most serious character. It involves the construction of an important clause in the Constitution of the State, and upon such construction depends the title to one of the highest and most honorable offices in the

gift of the State.  The Court, impressed by the gravity as well as the magnitude of the matter which it has had under consideration, while there is division of opinion, has, nevertheless, arrived at a conclusion concurred in by a majority of its members.  The opinion of each Justice will be rendered separately, and I proceed to state some of the reasons by which my mind has reached that conclusion upon which the judgment of the Court is based.

The action is brought in the name of the State by the Attorney General, and is against A. J. Shaw as occupant of the office of Judge of the Third Judicial Circuit of the State, claiming to have been elected thereto on the 12th day of February, 1875.  The second and third allegations of the complaint, and upon which the questions hinge, are as follows:

"2. That the Constitution of the State of South Carolina, Arti-IV, Section 13, provides that for each judicial circuit a Judge shall be elected by joint ballot of the General Assembly.

"3. That said A. J. Shaw was not elected Judge of the Third Judicial Circuit by joint ballot of the General Assembly, as the Constitution of the State requires, but was elected by the *viva voce* vote of the Senators and members of the House of Representatives met in joint assembly."

In the answer of the defendant it is alleged:

"That, in accordance with the provisions of the Constitution of this State, (Section 24, Article II, and Section 11, Article IV,) he was elected to the office of Judge of the Third Judicial Circuit on the 12th day of February, A. D. 1875, by the joint vote of the General Assembly of South Carolina, the members thereof voting *viva voce,* and their votes thus given being entered upon the journal of the house to which they respectively belonged, and that by virtue of said election he now holds and lawfully is in the exercise of the said office, and has not intruded into the same."

Section 11, Article IV, provides how vacancies shall be filled, and on this point there is no dispute.

Section 24, Article II, cited in the answer, is as follows:  "In all elections by the General Assembly, or either house thereof, the members shall vote *viva voce,* and their votes thus given shall be entered upon the journal of the house to which they respectively belong."

And upon this the defendant rests his title to the office. The facts are admitted, and the question becomes one of law solely, and, briefly stated, is thus:

It is claimed by the State, first, that where the manner or mode of voting at an election is prescribed by the Constitution, it must be observed, and that an election by any other mode of voting than the one prescribed is null and void; second, that the Constitution, in Section 13, Article IV, does prescribe the manner of voting at the election of Circuit Judges [*vide* above]; third, that the said mode or manner of voting as prescribed by the Constitution was not observed at the election by which defendant claims the office; fourth, and that, therefore, the election is a nullity, and the defendant has no right to the office.

On the other hand, it is contended that the second proposition above set forth is, in law, not true; but that the mode of voting at the election of Circuit Judges is prescribed and fixed by Section 24, Article II, as well as by Section 13, Article IV, of the Constitution, and that the former Section prevails as to the manner of voting, and that the latter Section applies only to the manner in which the two houses shall assemble for the purpose of voting; second, that the election of defendant was had in conformity to the requirements of both Sections of the Constitution, and that, therefore, the election is good in law, and the defendant lawfully holds his office.

The general proposition, that where the manner of voting is fixed by the Constitution it must be observed and obeyed, is not controverted. It is reduced, then, to the naked inquiry, is the manner of voting at election of Circuit Judges fixed by the Constitution? and, if so, what is that prescribed manner, and has it been complied with in this case? Both sides agree that the mode of assembly of the two houses for the purpose of voting is prescribed by Section 13, Article IV, and that the mode is joint assembly. But, in behalf of the State, it is argued that after the two houses have met the vote must be "by ballot;" whereas the defendant claims that the vote must be "*viva voce*," in obedience to Section 24, Article II, of the Constitution. Which is the law?

The case was argued on both sides with ability, and did the time permit I would avail myself much more, than under the circumstances is possible, of many of the suggestions and cited authorities, by which I would be aided in elaborating an opinion upon so grave

a subject. But it is obvious that if the Court has arrived at an unchangeable conclusion it is its duty to render a decision promptly. While it is important that the reasons should be clearly set forth, it is sometimes more important that the conclusion be announced and uncertainty be removed.

Let us now put together the two Sections in which the law of this case lies.

Section 24, Article II, Legislative Department: "In all elections by the General Assembly, or either house thereof, the members shall vote *viva voce*, and their votes thus given shall be entered upon the journal of the house to which they respectively belong."

Section 13, Article IV, Judicial Department: "And for each circuit a Judge shall be elected by joint ballot of the General Assembly."

Were the last Section considered alone, there could be no doubt about its meaning. "Elected by the two houses of the General Assembly met in joint assembly—voting by ballot." The word "joint," of necessity, qualifies the "General Assembly," for were it made to qualify the word "ballot," it would lead to the absurdity of saying "vote by a joint ball or ticket," which is impossible. We are forced to adopt the plain meaning established by the common use of the words, by parliamentary usage and by legislative enactments, all concurring. Indeed, the phrases quoted by counsel, "by joint ballot," "by ballot jointly," "jointly by ballot," and "joint ballot," in connection with elections by the two houses of the General Assembly, have interchangeably been so used, and with undisputed and undoubted signification, from the time of the adoption of the Constitution of 1788 to the time of the adoption of the Constitution of 1868.

But it is said that while "ballot" and "vote" are not synonymous, yet that by usage it has become common to use the word "ballot" in the sense of "vote," or the "act of voting," without any reference to the manner of voting; or, in other words, that "to ballot" may mean "to vote *viva voce*" or "to vote by ballot,"—that the true meaning is to be derived not so much from the word itself as from the context and the object in view. If this be so, could not Section 1, Article VIII, on the right of suffrage, which reads: "In all elections by the people the electors shall vote by ballot" be construed to mean "vote *viva voce ?*"

It is argued, however, that the meaning of Section 13, Article IV, is limited by Section 24 of Article II, which it is claimed is an universal rule and controls *all* elections by the General Assembly and annuls any subsequent provisions which may not be in accord with it. The proposition, then, is that the word "ballot" in Section 13, Article IV, is either a nullity, because in conflict with the rule set up as universal, or must be made to harmonize therewith by construing the word, if it be possible, to mean "vote." I see no difficulty in the coexistence and operation of the two provisions, even although the first be an universal rule and the second an exception thereto.

The first occurs in the Article on the legislative department, and defines and limits the power of the General Assembly with regard to elections in that body.

In Article III, the executive department, it will be found in Section 4 that when the election of Governor devolves upon the Legislature by reason of "two or more" of the candidates being "equal and highest in votes," it is provided that "the General Assembly shall, during the same session, in the House of Representatives, choose one of them Governor *viva voce.*"

In Article IV, judicial department, Section 2 provides that the Justices of the Supreme Court "shall be elected by a joint vote of the General Assembly," and, Section 13, Circuit Judges "by joint ballot of the General Assembly."

While it might be argued, and, perhaps, with force, that Section 24, Article II, relates only to elections of officers of the General Assembly, and to elections created by legislation, there can be but little doubt as to its having relation specially to that class of elections, for in only three cases does the Constitution order elections by the General Assembly, and in two of these it specifies the manner of voting, and leaves only the third—the election of Justices of the Supreme Court—subject probably to the provisions of Section 24, Article II. And if we were undertaking to go behind the words of the Constitution to interpret its meaning, it might be very forcibly shown why a difference is made in the mode of voting for Governor and for Circuit Judges by the General Assembly—the former having been previously voted for directly by the people, and the election of the latter having originated in the General Assembly.

This, however, is irrelevant, and it is unnecessary to do more than lay down the proposition that any general or universal rule is

subject to exceptions, when the exceptions emanate at the same time from an equal or the same power, and that is the present case. The 24th Section, Article II, is of force in so far as it is not varied by subsequent provisions in the same instrument.

It appears to me to be clear that the Convention so understood it, and adopted that Section to define the power of the legislative branch of the government, and then provided by succeeding Sections for the specific modes of conducting certain elections which confer offices of great importance.

The question is thus narrowed down to the last proposition, which is the strength of the case. Can the words "by joint ballot" be construed to mean "by joint vote," that thereby the two apparently conflicting Sections may be made to conform, and the election be conducted by voting *viva voce?* This depends solely upon the meaning of the word "ballot." If "a ballot" or "to ballot" can be considered to mean "a vote" or "to vote," that meaning should be adopted, for it would give the fullest force and effect to both Sections of the Constitution.

I will say here that while the argument was able and ingenious it did not impress my mind, and subsequent reflection has strengthened the conviction that the word "ballot" has a fixed, distinct and clearly-defined meaning, so absolute and so well understood as not to admit of a doubt.

The learned counsel for the defendant base their construction of the word "ballot" upon two grounds:

1. That the theory of the State Constitution is "that in all elections by the Legislature the action of each member should be open to the scrutiny of his constituents, so as to preserve the accountability of the legislator to the people.

2. That the word "ballot" must be taken in its "popular" sense, and in that sense its meaning is the "act of voting," without any designation of the manner of voting.

However plausible may be the policy of the principle set forth in the first ground,—and strong, had it been argued in the Convention,—it is of no avail now. When we go to say what is the law of the land, we must take the law as it is and not as it may have been. The rules of interpretation are well stated, as follows: "The way to ascertain     *     *     *     our obligations as they arise from instituted laws is to collect the meaning and intention of the law-

maker from some outward signs or marks; the collecting such intention from such signs or marks is called interpretation."

" Words are the common signs that mankind make use of to declare their intention to one another; and when the words of a man express his meaning plainly, distinctly and perfectly, we have no occasion to have recourse to *any other* means of interpretation."— Rutherford's Rules, Potter's Dwaris, 135.

And it is only where the words fail to express the meaning plainly, distinctly and perfectly that we can have recourse to conjecture, whether rational or probable. The first ground, therefore, is removed, unless the second is maintainable.

To cast any obscurity over the words " by joint ballot," it must be shown that the word "ballot" has two meanings when used in such connection and may have been employed in either sense by the Convention. And this becomes a question of evidence and authorities. The "popular" meaning of a word must be understood to be its correct meaning until the contrary is shown. Yet stronger is the presumption that in a convention which frames the constitution of a State words are used in their true signification, and they must be so accepted until the error is clearly proven.

What, then, is the true and correct meaning of this word ballot? It is of French origin, and has been adopted into the English language without any change in its meaning, so far as the authorities give us light. In the standard French dictionaries it is defined to mean "the act of voting by balls or tickets by putting the same into a box or urn;" "secret voting by means of ball or ticket." The examples in Richardson's English Dictionary clearly define its meaning to be the same as the French word, and I will quote one or two to show a little both of the meaning and history of the word in England:

" The greatest of the Parliament men hated this design of rotation and balloting as being against their power." "No Magistrate was to continue above three years, and all to be chosen by ballot; than which choice nothing could be more fair or impartial, as 'twas then thought, though opposed by many for several reasons."

In Worcester's Dictionary it is defined " a secret method of voting at elections; America—where the ballot is practiced." And so Walker, and so does Webster; and certainly had the word had any popular signification other than the above, it would have been given to us by Webster.

In an elaborate article on the word in the Encyclopædia Brittannica, the concluding sentence is as follows: "It is one of those matters of which it is necessary in a work like the present to give some *historical account*, and at the same time to explain its existing position as a political question, with a fair view of the arguments adopted by either side." So, also, an able essay on the same subject in the Encyclopædia Americana presents the word "ballot" as expressing the side of secret voting as against *viva voce* or public voting. In neither of these articles is the slightest deviation from the definition above cited, nor is there an intimation that any other meaning has ever been attached to the word. Ballot represents the one policy and *viva voce* the other.

It is to-day the question between parties in England. It is the main distinction between elections in England and the United States. It has been characteristic of France in her republican government, and is to-day an open question in every constitutional and legislative body that assembles in the United States. The expression "blackballing" still used in secret votes in clubs and private associations is the perpetuation of the ballot by white stones and black stones, by which the Dikasts cast their votes in the judicial assembly at Athens, and signifies the same as the *tabulæ* or *tabellæ* by which the secret votes were taken in Rome. Thus history and literature and the unswerving practice in the constitutional and legislative assemblies from 1788 to the present day show one invariable meaning and application of the word. And as it was used in the Constitution of 1868, so it had been used from the beginning of the existence of the State in reference to judicial elections.

In 1865 the question was agitated, and, as is cited in the argument for the defense, a change was urged by the Provisional Governor of the State, and finally was carried in the Convention assembled that year. The Legislature was commanded to vote *viva voce* in the election of Judges, and it was openly declared that it was so done to carry into effect the theory of responsibility and subjection of legislators to the scrutiny of their constituents. Again, in 1868, the Constitution was changed and the old method restored. Is it possible that it can be argued that the meaning of the word, so recently and with so much ardor discussed, was not understood? In Section 1, Article VIII, it is said that "in all elections by the people the electors shall vote by ballot." Could

the meaning of the word be more sharply defined than it is in that Section? The supposition cannot be sanctioned that the framers of the Constitution could have so trifled with a word of such magnitude as to have used it in senses exactly contrary to each other in two such important Sections of that instrument. The authority adduced to show that "by joint ballot" can mean "by joint vote," or that "ballot" means "vote," without regard to the manner of voting, is this: That in the journals of the Convention and of the General Assembly, and in the reports of elections by the public press, the word ballot is "applied as a generic term, denoting the 'act of voting' as often as it is used as a specific term confined to one particular mode of voting."

There is no authority to show that it has ever been so used in any parliamentary body in debate upon the question or in legislation upon the subject. The proposition, then, is in no wise sustained, nor can I think it sustainable. The use of the word relied upon by counsel is a mere abbreviation for the convenience of journalists and the press, and can in no wise be sanctioned to establish the meaning of words.

The evidence in the body of the instrument shows that the Convention understood the words it used, and upon opening the journal nothing is adduced to strengthen the defense. On the contrary, almost the initiatory debate in that body was upon "ballot" as opposed to voting by *viva voce*.

The fact that the 13th Section, Article IV, was passed at the second reading in the words "by joint vote, (Journal, p. 617,) and that it was subsequently changed and ratified in the words "by joint ballot," (Journal, p. 856,) compels us to conclude that the change was made for a purpose, and that purpose can be but the one indicated by the distinction between the words.

Finally, the ratification and adoption of the Constitution was submitted to the people of the State. The instrument was adopted as it is written, and that is what it means, and so it must stand.

It is with unfeigned reluctance that a majority of the Court has arrived at the conclusion reached in this case; but whatever may be the inconvenience or the individual hardships involved in the decision, it is our solemn duty to declare the law as it is written.

It is, therefore, ordered and adjudged that the plaintiff have judgment of ouster against the defendant, as prayed for in the complaint.

McIVER, A. J. While concurring fully in the opinion filed as that of the majority of the Court, it has been thought due to the dignity of the office in question, and the importance and gravity of the questions involved, that each of us should formally express our opinions. I, therefore, propose to state briefly some of the reasons which have brought my mind to such conclusion, although I cannot hope to add anything to the argument presented in the opinion of the majority of the Court.

The sole question involved in this case is, whether an election of a Circuit Judge by the General Assembly voting *viva voce* is a valid election. To determine this question, it is necessary to consider the provisions of the Constitution of this State relating to this subject, for the purpose of ascertaining whether that instrument requires such election to be made in any particular mode, and, if so, what that mode is. For no one will deny that if, by the terms of the Constitution, the election is required to be made in any particular mode, that mode is essential to the validity of such election, and a person who has been elected in any other mode has no legal title to the office.

It cannot escape the attention of the most casual reader of the Constitution that there are two distinct modes of voting not only provided for, but prescribed by that instrument in express terms— the one by ballot and the other by the *viva voce* system. It is likewise equally certain that these modes of voting differ in one, at least, most essential particular, the one implying secrecy, the other involving publicity, and, as matter of history, we know that the respective merits of these two essentially different modes of voting have been, and are yet, the subject of discussion in every country where the right of suffrage exists. Does the Constitution then prescribe that either of these modes of voting shall be adopted in the election of a Circuit Judge? and, if so, which of them is so prescribed? To answer this question, we naturally turn to the fourth Article of the Constitution, styled the "judicial department," and in Section 13 of that Article we find it ordained in explicit terms that "for each circuit a Judge shall be elected by *joint ballot* of the General Assembly." Now, if this Section stood alone, I presume it could not be doubted that the only constitutional mode of electing a Circuit Judge would be by ballot. But it is said that in Section 24 of Article II it is ordained that "in *all* elections by the General Assembly, or either house thereof, the members shall vote

*viva voce,* and their votes thus given shall be entered upon the journals of the house to which they respectively belong," and that it is necessary to put a construction upon the word ballot as used in Section 13 of Article IV different from its primary and well-recognized signification in order that the two Sections may be brought into harmony, upon the well-recognized principle that in construing an instrument like a constitution we must look at it as a whole and so construe its several parts as will prevent conflict and bring about harmony ; and that for this purpose, *if it should become necessary,* words and phrases may be read in a sense different from their usual and primary signification. It is, therefore, contended that the word ballot, as there used, signifies simply the *act* of voting, and is not designed to prescribe the *mode* of voting, and hence that the two Sections, thus read together, prescribe that the Circuit Judge shall be elected by the General Assembly, the two branches voting in joint assembly, but that the *mode* in which the voting is to be done must be by the *viva voce* system and not by ballot. It is very obvious that the word ballot is not used in this secondary sense anywhere else in the Constitution, for the only other place in which we have been able to find it is in the first Section of the eighth Article,—" in all elections by the people the electors shall vote by ballot,"—and there it is undoubtedly used in its proper and legitimate sense, as no one will for a moment contend that in any election by the people the electors would be at liberty to adopt the *viva voce* system. Now, while it may be admitted that, in a proper case, it is allowable, in construing a constitution, to attribute secondary significations to words and phrases differing materially from their usual and proper meaning in order to prevent a conflict between the different parts of such an instrument, yet this should not be done when such conflict can be avoided in a more natural and proper way, especially when, as we have seen, the rule contended for involves the *necessity* of giving a word of well-defined meaning not only different significations in different parts of the same instrument but a signification practically the very opposite of its original and usual meaning. Let us inquire, then, whether this apparent conflict between these two Sections of the Constitution cannot be reconciled in a more natural and proper way than by distorting the meaning of a well-defined term and attributing to the framers of the Constitution such gross carelessness and inattention to their duties as using the word ballot in one Section in its

proper and legitimate sense and in another Section in an opposite sense; for certainly voting by ballot and by the *viva voce* system are, for all practical purposes, precisely the opposite of each other.

There is no doubt of the correctness of the rule that where general terms, no matter how comprehensive they may be, used in a will, a statute or a constitution, are apparently in conflict with subsequent special provisions, such conflict may be avoided by regarding the latter as exceptions to the former, and that for this purpose Courts will read the two clauses as if words of exception were inserted. Applying this principle, then, to the two clauses under consideration, there is no real conflict, and they may be read together as providing that in all elections by the General Assembly the members shall vote *viva voce*, &c., except in the election of a Circuit Judge, in which case they shall vote by ballot. The fact that this is not the only instance in the Constitution in which this mode of reconciling an apparent conflict between different Sections becomes necessary indicates the propriety of adopting it rather than the one contended for by defendant's counsel. In at least one other instance there is an apparent conflict between other Sections of the Constitution, which can only be reconciled upon the principle which we have adopted in this case. In Section 10 of Article XIV it is ordained that the election for *all* State officers shall be held at the same time as is provided for that of members of the General Assembly. It is very manifest that in order to avoid a conflict with other Sections of the Constitution this Section must be read in connection with such other Sections by incorporating words of exception, *e. g.*, except such as are required to be elected by the General Assembly. It does seem, therefore, that the correct view to take of the two Sections of the Constitution which give rise to the controversy in this case (Section 24 of Article II and Section 13 of Article IV) is to regard the former as simply declaring a general rule for the guidance of the General Assembly, to which the latter furnishes an exception, and that while, as a rule, the *viva voce* system was to be the mode of voting in elections by the General Assembly, yet that, in case of the election of a Circuit Judge, an exception was established requiring that such election should be by ballot. This view is sustained by reference to the journal of the Convention which framed the Constitution, to which we are at liberty to refer in cases of doubt, in order to ascertain, if practicable, what intention was in the minds of those who used the words in ques-

tion.  This journal shows:  1. That the distinction between the different modes of voting—*viva voce* and by ballot—was fully understood and appreciated in that body;  2. That the 13th Section of Article IV, as originally adopted, contained the words "joint vote" instead of "joint ballot;"  3. That it was finally adopted in its present form.  Why, then, was the change made from "joint vote" to "joint ballot," if these words are now to be construed as meaning the same thing?  The conclusion is irresistible that the framers of the Constitution, appreciating, as we have seen that they did, the distinctive feature of the system of voting by ballot, in making the change from "joint vote" to "joint ballot," intended to make a substantial and not a mere verbal alteration.  For in substituting for the word "vote," which was equally applicable to *either mode* of voting, the word "ballot," appropriate only to *one* of such modes, they unmistakably indicated their purpose that such mode only should be adopted, so far as that particular election was concerned.

It is said, however, that the words "joint ballot" must be construed as meaning merely the *act* of voting rather than the *mode* of voting, in order to avoid an absurdity, inasmuch as there can be no such thing as a *joint* ballot in the primary sense of the term ballot—a small ball or ticket,—and therefore, as here used, it must be given its secondary meaning.  Without stopping to consider whether the word ballot has ever acquired such secondary meaning except in the loose and careless language of the public press or in the journals of deliberative assemblies, where abbreviated forms of expression are quite common, no instance of such meaning having been found in any work of authority emanating either from lexicographers or legal writers, or to show that the phrase "joint vote," as found in Section 2 of Article IV, is open to the same criticism, as it is quite as absurd to speak of *joint* vote as of *joint* ballot, it being just as impossible for two persons to give a *joint viva voce* vote as it is for them to put in the ballot box a *joint* ballot, as they can no more vote with a *joint voice* than they can with a *joint ball or ticket*, it is quite obvious that the phrase "joint ballot" means jointly by ballot, just as the phrase "joint vote" means jointly by *viva voce* vote.  In other words, that the word joint was inserted in each instance merely for the purpose of showing that the two branches of the body which was to elect should act together, and not separately, as they do in performing their usual and ordinary duties.

Accordingly we find, by reference to the constitutional and legislative history of this State, as cited in the argument, that the phrases "jointly by ballot," "by ballot jointly" and by "joint ballot" have been indsicriminately used as interchangeable terms, signifying always the same thing as that above attributed to the words " by joint ballot" in the clause of the present Constitution now under consideration.

I am, therefore, most reluctantly forced to the conclusion that the defendant in this case, not having been elected in the mode prescribed by the Constitution, has no valid title to the office in question, and that upon the demand of the State, through its Attorney General, judgment of ouster must go against the defendant.

WILLARD, C. J., (dissenting.)    The Constitution (Article II, Section 24,) provides that in all elections by the General Assembly, or either house thereof, the members shall vote " *viva voce*," and their votes thus given shall be entered upon the journals of the house to which they respectively belong.

Again, it provides (Article IV, Section 13,) " the State shall be divided into convenient circuits, and for each circuit a Judge shall be elected by joint ballot of the General Assembly."

It is contended by the State that the provision as to electing by joint ballot is equivalent to a declaration that the Circuit Judges shall be elected by ballot, and thus creates an exception to the generality of the words declaring that all elections by the General Assembly shall be by "*viva voce*" voting.    The respondent, on the other hand, contends that the sole object of the declaration as to electing by joint ballot was to designate the body that should elect the Circuit Judges, namely, the united bodies constituting the General Assembly, joined together for that purpose in one body.

The rule of construction applicable to the case recognizes the fact that words expressing the universal application of a statutory requirement to all cases of this class to which it relates may be restricted not only by the use of technical words, importing exception or limitation, and by more general expressions having an equivalent effect and directly disclosing an intention to create exceptions or limitations, but also by implication inferring such intent as a necessary means of reconciling provisions otherwise inconsistent.

It is only as a necessary implication that such a conclusion can be drawn inferentially. It is only the impulsive force of necessity that can justify an encroachment upon the direct terms of a rule of universal application.

It follows that when the law-making authority has established a rule in terms extending to all cases of the class embraced in it, and has not subjected it to express limitation or exception, an exception or limitation can only be implied where the provisions from which this implication is sought admit of no reasonable interpretation consistent with the direct sense of the terms of the general rule.

It would also follow that where the sense and intention of the words claimed to operate as a limitation are of doubtful import, admitting of different constructions, some consistent with the general rule and others inconsistent with it, an exception or limitation cannot be implied.

I am satisfied that at the least the intention of the Constitution involved in the present case is doubtful. This might be inferred from the fact that the Legislature for eight years immediately succeeding the adoption of the Constitution adopted the sense claimed for it by the respondent, and that the entire circuit judiciary was organized during that time upon that understanding of the Constitution.

It is not an unreasonable construction that the framers of the Constitution may have intended by the language of Section 13, Article IV, to merely designate the body by which the Circuit Judges should be elected, leaving the mode of election to be determined by that Article and Section that dealt directly with that subject. Whether such was their actual intention, it is not important, under the view I take of the case, to inquire, it being sufficient for the purposes of the present case to ascertain that such is not in itself an unreasonable construction.

If this be the case, we are bound to adopt that construction which is in harmony with the antecedent provision prescribing the mode of voting in all cases of election by the General Assembly. In order to warrant an encroachment upon the terms of the general rule, we must find a construction inconsistent with that general rule, for it is only by the fact of such inconsistency that we can compel the terms of the general rule to give way before external force. We are not at liberty to raise up a force to antagonize a

great fundamental provision of the Constitution on speculative grounds or verbal refinements, especially where that fundamental provision is intended to apply to a principle inherent in the nature of the exercise of representative powers in government.

It is easy to see that the provision as to *viva voce* voting by the representatives of the people was based upon the general idea that the voting of representatives should be open and responsible, as they act, not in their own interest, but in the interest of the public. This principle is put in opposition to that of secret voting, which is clearly appropriate when the voter acts from his individual choice, arising solely from his sense of personal duty or interest.

It has been said that this is a speculative opinion merely, about which there have been differences of opinion, but it is clear that the Constitution of 1868 took this question out of the forum of speculative opinion and placed it among the cardinal principles on which the government should be administered, and we are bound to consider it in that light.

I regret that I am compelled to differ from the majority of the Court, but it seems to be the inevitable consequence of my understanding of the rules and spirit of constitutional construction.